## MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *v.* SILVER ET UX.

[No. 43, September Term, 1971.]

*Decided November 15, 1971.*

440

*Motion for rehearing filed December 3, 1971; denied December 8, 1971.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Ambrose T. Hartman, Deputy City Solicitor,* and *Gerald S. Klein, Assistant City Solicitor,* with whom was *George L. Russell, Jr., City Solicitor,* on the brief, for appellants.

*Eugene Hettleman* for appellees.

*Amicus Curiae* brief filed by *George M. Radcliffe, Edgar H. Gans, Wilbur D. Preston, Jr.,* and *Stanley B. Rohd* on behalf of themselves.

FINAN, J., delivered the opinion of the Court.

On April 19, 1861, riots broke out in the streets of Baltimore inspiring James Ryder Randall to wax poetically, "Avenge the patriotic gore that flecked the streets of Baltimore." [1] The occasion was the passage of Union troops through the City and in the aftermath, one Poultney, a gunsmith, sued the City for the negligence of the authorities in failing to afford police protection to his shop which was looted of firearms. At common law a municipality generally is immune from actions for injuries occasioned by its negligence or nonfeasance in the exercise of functions essentially governmental in character (*Wynkoop v. Hagerstown,* 159 Md. 194, 198, 150 A. 447 (1930)), but Chapter 137 of the Acts of 1835 ("The Riot Act," subsequently codified as Article 82 of the Maryland Code) under certain circumstances renders a municipality liable for damages sustained to private citizens resulting from the failure of the City to prevent or contain riotous acts. *Baltimore v. Poultney,* 25 Md. 107,

---

1. First Stanza, "Maryland, My Maryland," adopted as official State song by Ch. 451, Acts of 1939.

126 (1866). The same Article 82 is presently Code (1969 Repl. Vol.), Article 82, §§ 1 through 4 inclusive.[2]

On April 6, 1968, some 107 years later, the vestigial winds of prejudice having not yet abated in this land, Dr. Martin Luther King, Jr. was assassinated in Memphis, Tennessee, and in the wake of this event civil disorders broke out in the City of Baltimore and continued for several days. This was a part of a pattern experienced in other large municipalities in the Nation. As a result of damages sustained to real and personal property, citizens and corporations have filed some 400 civil suits against the Mayor and City Council of Baltimore (City)

---

2. Article 82 of the Maryland Code provides as follows:

"1. If in any county or incorporated town or city of this State, any church, chapel or convent, any dwelling house, any house used or designed by any person or any body corporate as a place for the transaction of business or deposit of property, any ship, shipyard or lumberyard, any barn, stable or other outhouse, or any articles or personal property shall be injured or destroyed, or if any property therein shall be taken away, injured or destroyed by any riotous or tumultuous assemblage of people, the full amount of the damage so done shall be recoverable by the sufferer or sufferers by suit at law against that county, town or city within whose jurisdiction such riot or tumult occurred.

2. No such liability shall be incurred by any county, incorporated town or city, unless the authorities thereof shall have good reason to believe that such riot or tumultuous assemblage was about to take place, or having taken place, shall have had notice of the same in time to prevent said injury or destruction, either by its own police or with the aid of the citizens of such county, town or city, it being the intention of this article that no such liability shall devolve on such county, town or city, unless the authorities having notice have also the ability of themselves, or with their own citizens, to prevent said injury; and all causes of action under § 1 shall be prosecuted within the period of three years from the time of accrual of the same.

3. In no case shall indemnity be recovered when it shall be satisfactorily proved that the civil authorities and citizens of said county, town or city, when called on by the civil authorities thereof, have used all reasonable diligence and all the powers intrusted to them for the prevention or suppression of such riotous or unlawful assemblages.

4. In any suit instituted under this article, the plaintiff may declare generally and give the special matter in evidence."

seeking redress. Another 1500 suits are anticipated prior to the expiration of limitations.[3]

At this point, the City recognizing that as a municipal corporation its standing to raise constitutional issues might be questioned, filed a petition for declaratory judgment in which Charles L. Benton, the City Director of Finance, John A. Leutkemeyer, the City Treasurer, and F. Pierce Linaweaver, the City Director of Public Works, joined as plaintiffs. The declaratory judgment proceeding was brought against John and Hazel Silver, the plaintiffs in one of the cases on the Civil Disturbance Docket and the appellees herein. The appellees filed an answer to the petition for declaratory relief in which they suggested that the City could make use of methods of preventing or restraining civil disorders other than by the solitary employment of the police department in order to satisfy the requirements of Article 82. The City then filed a motion for summary judgment which was heard before Harris, J., of the Superior Court of Baltimore City, along with the City's demurrers in three test cases. In an able memorandum opinion filed on August 12, 1970, Judge Harris concluded that the City's demurrers in the test cases should be overruled, that the motion for summary judgment in the declaratory judgment proceeding should be denied, and that the petition for declaratory relief should be dismissed. A final order to this effect was issued by the court on December 21, 1970. The City now

---

3. These cases have been placed upon a special docket of the Superior Court of Baltimore City known as the "Civil Disturbance Docket." The City's first defense in these cases was to file motions to dismiss on the theory of the inapplicability of Article 82 to the City. A case was selected for decision on the motion to dismiss and after hearing, the motion was denied in an excellent opinion by Sklar, J., in Lawson v. Mayor and City Council of Baltimore, Sup. Ct. of Balto. City, 3 C. D. (1968). The City then filed a demand for particulars which was granted over plaintiffs' objections. After the declarations on the Civil Disturbance Docket were particularized, the City filed demurrers predicated on the denial of due process and equal protection which would result to the City and its taxpayers through the application of Article 82, because of the City's legal inability to control the Baltimore City Police Department. These cases are not a part of the present appeal but are being held in abeyance pending the outcome of the declaratory judgment in the present appeal.

appeals that portion of the order which denies the motion for summary judgment and dismisses the declaratory relief proceeding.

The City once more contends that in view of The Police Omnibus Bill, Ch. 203 of the Acts of 1966, whereby the Police Department of Baltimore City was established as an agency and instrumentality of the State, it is legally incapable of controlling the police department and accordingly the application of Article 82 constitutes a deprivation of due process and equal protection of the law to the City and its taxpayers. Thus after more than a century of relative obscurity, "The Riot Act," Article 82 becomes the center of controversy in the present case.

We first turn to a consideration of Article 82. Historically, the granting of redress to citizens who have sustained damages to property as a result of public riots which have not been prevented or contained by civil authorities is anything but novel.[4] The Supreme Court of the United States, tracing the ancient lineage of this remedy in a discussion of a similar Illinois statute in *Chicago v. Sturges*, 222 U. S. 313, 32 S. Ct. 92 (1911), made the following observation:

> "The policy of imposing liability upon a civil subdivision of government exercising delegated police power is familiar to every student of the common law. We find it recognized in the beginning of the police system of Anglo-Saxon people. Thus, 'The Hundred,' a very early form of civil subdivision, was held answerable for robberies committed within the division. By a series of statutes, beginning possibly in 1285,

---

4. "The Riot Act" (Ch. 137 of the Acts of 1835) was enacted in Maryland as a result of the "Bank Riots" which occurred in Baltimore from August 6 through August 10, 1835, as a result of the Bank of Maryland going into receivership in the sweep of the national bank crises during the administration of President Jackson. Baltimore mobs assaulted the homes of the directors of the bank and of the eminent Reverdy Johnson, Esq., counsel for the bank. James H. Fitzgerald Brewer, "Democratization of Maryland," in *The Old Line State*, pg. 62 (Dr. Morris L. Radoff, ed. 1971).

in the statutes of Winchester coming on down to the 27th Elizabeth, the riot act of George I and act of George II, Chap. 10, we may find a continuous recognition of the principle that a civil subdivision intrusted with the duty of protecting property in its midst, and with police power to discharge the function, may be made answerable not only for negligence affirmatively shown, but absolutely as not having afforded a protection adequate to the obligation. * * *." 222 U. S. at 323-324.

It is of equal interest to note that, although the principle of communal responsibility for criminal violence made an early appearance in England, it enjoys an even more ancient recognition in Eastern culture as a similar provision is found in Sections 23 and 24 of the Code of Hammurabi.[5] Today some twenty states have statutes of similar import. See *Criminal Victim Compensation,* 30 Md. L. Rev. 266 (1970) ; *Compensation for Victims of Violent Crimes,* 61 Northwestern L. Rev. 72 (1966), and *The Aftermath of the Riot,* 116 Univ. Pa. L. Rev. 649, 684 (1968).

A reading of the Maryland statute makes it abundantly clear that the core of the statutory liability for riot damages is negligence on the part of those in authority who are charged with the responsibility and are vested with the power to maintain public peace. Some statutes raise the conclusive presumption that the occurrence of riot damage was caused by the local government's failure to properly use its power and authority to maintain peace, but such is not the case with the Maryland law which is less stringent in its requirements. Article 82 requires that the plaintiff prove by a fair preponderance of af-

---

5. Sections 23 and 24 of the Code of Hammurabi provided respectively:
"If the brigand be not captured, the man who has been robbed, shall, in the presence of god, make an itemized statement of his loss, and the city and the governor, in whose province and jurisdiction the robbery was committed, shall compensate him for whatever was lost."

firmative evidence that, (1) the City had good reasons to believe that a riot was about to take place, or (2) having taken place, the City had notice in time to prevent property destruction, and (3) having notice, the City had the ability of itself, or with its own citizens to prevent the injury. In addition, Section 2 of Article 82 provides that as a "condition of liability" no indemnity shall be forthcoming if the local government uses all reasonable diligence and all powers entrusted to it for the prevention or suppression of riots.

An earlier version of Article 82, but not different from the present in substance, was affirmed as to its constitutionality in *Hagerstown v. Sehner,* 37 Md. 180, 189 (1872). In the present case, the appellants do not question the constitutionality of Article 82, *per se,* but only with regard to its application to the City in view of Chapter 203 of the Acts of 1966 commonly referred to as The Police Omnibus Bill and a corollary piece of municipal legislation, Article II, Section 27 of the Baltimore City Charter (1964 Revision). Therefore, to understand the constitutional vulnerability which the City attaches to Article 82, we must turn to an analysis of The Police Omnibus Bill.

The City makes a persuasive argument that as early as 1860 the General Assembly of Maryland was intent upon taking the City of Baltimore out of the business of controlling civil disorders. See Chapter 7 of the Acts of 1860, as amended by Chapter 367 of the Acts of 1867. A graphic description of the reason for such a drastic change in police control was narrated by our predecessors in *Upshur v. Baltimore,* 94 Md. 743 (1902) :

> "* * * For some years prior to the adoption of the Act of 1860, Ch. 7, and, therefore, during a period when the police force was wholly under the control of the municipality, the city authorities failed to suppress the disorder and lawlessness which prevailed to an alarming extent, and the riots and blood-shed which invari-

ably accompanied a general or local election. The law was defied; the public peace was disturbed; the constabulary were powerless, if not in sympathy with the mob, and reputable citizens were driven by violence from the polls. Relief from the intolerable conditions which existed was finally sought by an appeal to the General Assembly, and the Act of 1860, Ch. 7, completely separating the police department from the city government, was the result. The Police Board was created and its members and the force enrolled by them were made state officers and the city was denied, in the most positive manner, any right to interfere with or control the policemen. The underlying purpose was to deprive the city of all power over the police * * *." 94 Md. at 756.

An informative and entertaining account amply documenting the reasons for "The Police Reform Bills" is found in an article by H. H. Walker Lewis, "The Baltimore Police Case of 1860," 26 Md. L. Rev. 215 (1966).[6]

The 1860 Act establishes a State controlled police board for the City and the City's police function was restricted to legislation, i.e., the passage of ordinances for preserving order, securing property and persons from violence, danger or destruction, etc. The Act also carried the sanction that neither the Mayor nor any officer of the City should in any manner "impede, obstruct, hinder or intervene with the said Board of Police, or any officer, agent or servant thereof or thereunder." However, the Act contained a significant clause which was designed to make the City liable for police failures, stating, "nothing in this article contained shall be taken to destroy or diminish the liability * * * of the Mayor and City

---

6. This article notes that during the mayoralty election in Baltimore City in 1856, in which the "Know Nothing" party emerged successful, 14 persons were killed in election disorders, the Baltimore City Police Force being generally recognized as woefully ineffective. 26 Md. L. Rev. at 220.

Council * * * for any failure to discharge the duties or obligation of said corporation * * *, the board of police hereby created being, and they are hereby constituted to be, authorities of said corporation, * * * to the same effect as if created and appointed by or under the said Mayor and City Council. * * *"

By Chapter 367 of the Acts of 1867, the Act of 1860 was pointedly amended to remove the incongruous imposition of liability of the City for the acts of the police department over which it had no control. The opinion of this Court in *Adams v. Baltimore Transit Co.*, 203 Md. 295, 311, 100 A. 2d 781 (1953), appears to establish beyond cavil that the City has no power with regard to the enforcement of the law but only with regard to the passages of regulatory ordinances. *Altvater v. Baltimore*, 31 Md. 462, 468 (1869) also establishes the proposition of the City's non-liability for activities entrusted to the police department, in that instance the enforcement of an anti-sledding ordinance. See also *Sinclair v. Mayor and City Council of Baltimore*, 59 Md. 592, 596 (1883).

By the Act of 1860 the Police Board, under Section 13, could call upon the sheriff to form a "posse comitatus" for the purpose of preserving the peace, and likewise the Board could command all conservators of the peace in the City. Section 6 of the Act also authorized the Police Board to raise additional forces for "extraordinary emergencies." Sections 14 and 15 removed the City's power to raise and pay any other police force, and by Section 16 any attempt by the City to interfere with State control of the police force was made a criminal act. As will be developed later in this opinion, The Police Omnibus Act (Chapter 203 of the Acts of 1966) makes no mention regarding the manner in which a "posse comitatus" may be raised. In fact, the last mention of a "posse comitatus" is found in the 1949 Edition of the City's Public Local Laws under Section 550, wherein the provisions of the 1860 Act are codified as amended by Chapter 367 of the Acts of 1867. We cannot, however, agree with the City's contention that the failure to in-

clude in The Police Omnibus Act of 1966 any mention of the manner in which "posses" may be raised, is indicative of a Legislative intent to abolish this common law institution, as an anachronism in modern day society.

Thus it may be fairly stated that The Police Omnibus Act of 1966, the Act which affects the instant case, does not differ greatly from its predecessor acts insofar as separating the City from any control over the police department is concerned. In The Police Omnibus Act of 1966, control of the department is vested in the State with immediate supervision and direction of the department under a police commissioner who is appointed by the Governor.[7] Further support for the autonomy of the police department is found in Article 2, Section 27 of the Charter of the City which provides that, "[N]o ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder, or interfere with the powers of the Police Commissioner."

However, an appreciation of the relationship between the City and the police department cannot be fully grasped unless it is understood that the City is the agency responsible for appropriating money for the operation of the police department and that the police commissioner must annually appear before the Board of Estimates of the City to defend his budgetary requests. Section 533(a)

---

7. Chapter 203, Acts of 1966 (Police Omnibus Bill)
   "Section 527
   (a) The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland. The purpose generally of the department shall be to safeguard the lives and safety of all persons within the City of Baltimore, to protect property therein, and to assist in securing to all persons the equal protection of the laws. * * *
   "Section 529
   The affairs and operations of the department shall be supervised and directed by a commissioner of police, who shall function as the chief police and executive officer of the department, and be known as the Police Commissioner of Baltimore City.
   "Section 530
   (a) The Police Commissioner of Baltimore City shall be appointed by the Governor of Maryland for a term of six years, * * *."

Chapter 203 of the Acts of 1966. Certainly, although this in itself could not be construed as a method of indirect control over the police department by the City, nonetheless one would be overly naive not to think that such a situation would provide the occasion for the flow and exchange of communications, accommodations and cooperative action between the City and the police commissioner.

The thrust of the City's contention is that a reasonable construction of The Police Omnibus Act of 1966, together with Article II, Section 27 of the City Charter, for all practical purposes emasculates the City of any power or ability to prevent or contain riots. The City has made a most persuasive argument as to the unconstitutional exposure to liability in which it is placed under Article 82 ("The Riot Act") by virtue of its lack of control over the police department. Indeed, this argument might be completely unanswerable if control of the police department were the only demonstrable means available to prevent or suppress riots and tumultuous actions. However, we think the answer is, as Judge Harris succinctly stated in the lower court, that "Article 82 was not intended to be based on the requirement that the Mayor and City Council must have control over a police force to have the ability to suppress riots." Support for this proposition is found in the case of *Hagerstown v. Dechert*, 32 Md. 369 (1870).

At the time of *Dechert, supra*, the City of Hagerstown not only had no municipal police force but had no lawful power to create or employ a police force to prevent or suppress riots. On May 24, 1862, Dechert's property was destroyed by the actions of a tumultuous assemblage. Dechert, some hours prior to the riot, had notified the Mayor of Hagerstown of the threatened destruction of his property and requested protection. Neither the Mayor nor any town officials took any steps or employed any means to prevent or suppress the actions of the crowd. The City of Hagerstown took the position that unless the City Charter had bestowed on the corporate authorities the power to raise a police force for the purpose of pre-

venting or suppressing riots, that, no liability could devolve upon it under Article 82. The Court held that, assuming arguendo, Hagerstown could not create a police force, nonetheless, the Mayor, by virtue of his office had certain powers of a Justice of the Peace (Chapter 198 of the Acts of 1847) namely, that of a "conservator of the peace" and that:

> "* * * As a conservator of the peace, he had full authority to call on the citizens to aid in the prevention and suppression of the riot, and their legal duty was to obey the call. 'The general duty of the conservators of the peace, by common law is to employ their own and to command the help of others to arrest and pacify all such, who, in their presence, and within their jurisdiction and limits, shall go about to break the peace.' 3 Burn's Just. 4." 32 Md. at 384-385.

The Court in *Dechert* held that it was also pertinent to the issue of liability to inquire as to whether the Mayor had called upon Hagerstown's one Justice of the Peace for aid, this bearing on the question of whether the Mayor acted with diligence in the prevention or suppression of a riot. Thus we see that Article 82 was held applicable to the situation, even though Hagerstown was without a police force. In the instant case, the City of Baltimore was not in as desperate a condition as was Hagerstown in *Dechert*. In the civil disturbance in 1968 there was present in the City at least a police force, although State controlled.

Furthermore, although the City of Baltimore had no authority over the police department we think that among the various courses of action that the Mayor might have taken, and perhaps did take, was to have conferred with the police commissioner and made requests for specific kinds of police action. As will be developed later in this opinion, the question as to whether such action was taken, or whether other action was taken by the Mayor in his capacity as a conservator of the peace, as well as the

practical effect of such action, may well be questions which should be determined by the trier of facts at a hearing on the merits of the case. It suffices at this point to conclude that *Dechert,* at least stands for the proposition that failure to have control over a municipal police force does not excuse a municipality from endeavoring to suppress or contain riots or tumultuous actions by using other reasonable means available. Of similar import, see *Williams v. City of New Orleans,* 23 La. Ann. 507, 508 (1871).

The next question is, what, if any, reasonable means were available to the City to prevent or suppress the incidents which occurred about 5:00 P.M. on April 6, 1968, and continued for several days and nights thereafter. We have already stated that on the basis of the holdings of our predecessors in *Hagerstown v. Dechert,* the Mayor is cloaked with the authority of conservator of the peace. In addition, Article IV, Section 4 of the Charter of Baltimore City (1964 Revision) specifically designates the Mayor "a conservator of the peace." In the language of *Dechert* as a conservator of the peace, he had "full authority to call on the citizens to aid in the prevention and suppression of the riot," if such action appeared to have been within the purview of "reasonable diligence." Within this same ambit of reasonable activity it may have been feasible for the Mayor to have formed a "posse comitatus."

An elaboration on what these ancient vestiges of authority entail is certainly appropriate. The following comment is found in Alexander's British Statutes, Vol. 1, pgs. 272-273 (Coe's ed.).

> "The common law requires sheriffs, constables, and other peace officers, to do all that in them lies towards the suppression of riots, and they may command others to assist them, *State v. Mayhew,* 2 Gill. 501. It is no excuse that from the number of rioters the single aid of the person so called upon would have been of no use,

> *R. v. Brown,* 1 Car. & M 314, where the requisites to support an indictment against a person refusing to aid a constable in quelling a riot are stated. * * * Stat. 34 E. 3, C. 1, authorizes justices of the peace to restrain and arrest rioters and this has been construed to give a single justice power to arrest persons assembled riotously by raising the power of the county, if necessary, and to authorize others to arrest them by a bare parol command, and the persons so commanded may pursue and arrest the offenders in his absence. By Stat. 17 R. 2, C. 8, the sheriff and other of the King's ministers, generally have power to arrest rioters with force, and by 13 H. 4, C. 7, any two justices with the sheriff may come with the posse comitatus, if need be (all persons, except clergymen, persons decrepit, women, and infants under fifteen, being bound to attend the justices in suppressing a riot, under pain of fine and imprisonment) and suppress any riot, rout or assembly, arrest the rioters, or persons coming from thence riotously arrayed. * * *."

See Article 5 of the *Declaration of Rights of the Constitution of Maryland* and annotations thereunder in Code, Vol. 9A (1963 Repl. Vol.), pgs. 23 and 24, for authority that certain British Statutes were adopted in Maryland as they existed on July 4, 1776.

In the recent compilation of historical essays by the Maryland Hall of Records, titled, "The Old Line State" (Radoff ed. 1971), we find the following account of what appears to be a form of "posse comitatus" in action in J. H. F. Brewer's "Democratization of Maryland, 1800-1837," at pg. 63:

> " * * * The great national banking crisis now was extended into Maryland, and the removal of the deposits of the government from the Bank of the United States (peculiarly the idea of

Roger B. Taney) spread a vicious circle of confusion and dangerous insolvency among the great banks of Baltimore. Ultimately, on March 22, 1835, the Bank of Maryland suspended operations and went into the hands of receivers. The president, trustees, counsel and creditors then began a bitter series of pamphlet charges and countercharges against each other until in the welter of confusion the general public became convinced that roguery was at the heart of the matter.

From August 6th through August 10th, mobs assaulted the homes of the directors, and of Reverdy Johnson, the counsel; and law and order collapsed as Baltimore became again 'Mobtown.' Mayor Jesse Hunt resigned, and General Anthony Miltenberger, president of the first Branch of the City Council, asked the direct aid of eighty-three year old General Sam Smith. With the decision which characterized his every action, the old hero of North Point mobilized an informal militia of responsible citizens and began the systematic patrolling of the streets. Thus ended the Bank Riots, but judicially the prosecution and punishment of the offenders extended into the next year, and the property damaged and ruined was compensated for by an act of the legislature of August 6, 1836."

The City vigorously contends that any present day reliance on a "posse comitatus," or upon the exercise of the function of a conservator of the peace, whether exercised by the Mayor or by a Justice of the Peace, a Judge, or by the Sheriff or by any of these at the Mayor's request, would be an anachronism in the context of a present day civil disturbance of the magnitude experienced by Baltimore. Indeed, the City dismissed by resort to the argument of *reductio ad absurdum* any pro-

posal that the Mayor, as a conservator of the peace or by calling up a "posse comitatus," could have prevented or suppressed the tumultuous actions of April, 1968. Furthermore, the City generalizes that armed roving patrols or "posses" would have impeded and obstructed the police rather than assisted them in preserving the peace.

All this may be true, but we think the City is missing the point. It is not for this Court to state here and now, at this stage of the litigation, that the Mayor should or should not have formed a "posse comitatus" or exercised other common law prerogatives of a conservator of the peace. The important thing to remember is that, in our opinion, these powers are still viable and inhere in the office of Mayor and it should be a matter for the trier of facts to determine whether, under the exigencies of the situation, the Mayor, in the exercise of reasonable diligence, should have evoked such powers. Concededly, today there are few General Sam Smiths around or modern day counterparts of the "hero of North Point," nonetheless, whether an effort in this direction would have been an exercise in futility is a matter of proof. Likewise, we do not believe that the provision in Article II, Section 27 of the City's Charter which prohibits it from doing anything to "conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner," was intended to foreclose liaison between the police commissioner and the Mayor. We think this is particularly so with regard to agreeably supplemental efforts to those of the police department on the part of the City in preventing or quelling civil disturbances.

The City also argues that the authority to form a "posse comitatus" was repealed by implication by virtue of the failure of The Police Omnibus Act of 1966 to include or mention such a procedure, as was provided in the previous acts. However, we see no validity to this argument. We must presume that the Legislature, knowing that repeal by implication is never favored by the Court, would have expressed a clear intent to abolish the institution of a "posse comitatus" by the language of the

statute, if that were its desire. See *Bowie v. Washington Suburban Sanitary Comm.*, 249 Md. 611, 618, 241 A. 2d 396 (1968), and *Planning Comm. v. Silkor Corp.*, 246 Md. 516, 524, 229 A. 2d 135 (1967).

Additionally, the City would consider as nil the authority of the Mayor as a conservator of the peace, contending that Article IV, Section 4 of the Charter of Baltimore City (1964 Revision) is without effect because it conflicts with The Police Omnibus Act and with Article II, Section 27 of the City Charter. We do not so view it. In *Heubeck v. City of Baltimore*, 205 Md. 203, 208, 107 A. 2d 99 (1954) we stated:

> "The only limitations upon the police power of the City are found among the provisions of Article XI A of the Maryland Constitution, often referred to as the Home Rule Amendment and the Baltimore City Charter, the granting of which was made possible by said Home Rule Amendment."

The City possesses all of the police powers as that enjoyed by the State, within the city limits, except as such powers may be expressly limited by the Constitution of Maryland or some public general law *Heubeck, supra; R. B. Construction Co. v. Jackson*, 152 Md. 671, 674, 137 A. 278 (1927) ; *Rossberg v. State*, 111 Md. 394, 410, 411, 74 A. 581 (1909). Article II, Section 27 of the Charter of the City (1964 Revision) states that the Mayor and City Council of Baltimore is:

> " * * * To have and exercise within the limits of Baltimore City all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits; provided however that no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."

We are therefore of the opinion that the powers associated with that of a conservator of the peace and the power to form a "posse comitatus," which is included in the powers of a conservator of the peace, were powers available for employment by the City, through the Mayor, should the exercise of reasonable diligence have dictated that they be used.

We must not lose sight of the fact that the posture in which this case is before us is that the City is asking us to rule that Judge Harris erred in refusing to grant its motion for summary judgment by which motion the City in effect contends that, as a matter of law, it should not be held liable for any property damage sustained by property owners as a result of the civil disturbances during April of 1968. In support of this contention we have seen that it argues that the City or its proper officials could not have reasonably done anything to prevent or suppress the civil disturbances. We have already pointed out that we think there were sources of action available to the City, other than by employment of the police department over which concededly it has no control. We do not intend by what we have stated to convey the idea that the exercising of the power of a conservator of the peace or the forming of a "posse comitatus" were all of the powers which might have been available to the City. As Judge Sklar stated in *Lawson v. Baltimore,* Sup. Ct. of Balto. City, the Daily Record, July 22, 1968, one of the cases being held in abeyance, awaiting the opinion of this Court in the instant case:

> "It is not the intention of this Court to speculate what the City could have done or to judge the sufficiency of what was done by the City. Such questions are to be determined by the trier or triers of fact."

A reading of the briefs of counsel for the appellees and the *amicus curiae,* as well as the record extract, reveals a full panoply of facts which the damaged property owners deem pertinent and which they will apparently en-

deavor to prove, given the opportunity. Great stress is laid on the allegation that the Mayor and local authorities had sufficient warning that tumultuous action would spill over from Washington, D. C. some forty miles away, and break out in the predominantly Negro sections of Baltimore City. It is alleged in the statement of facts that the Mayor had a round of conferences regarding the situation throughout the day and evening of April 5, 1968, the day before the civil disturbances broke out. (The City does not concede that the civil disturbances achieved the status of a "riot.") Specifically, it is stated that the Mayor and Governor Agnew held a meeting in Annapolis at 10:00 A.M. on April 6, 1968, at which time the Governor emphasized his fear that disturbances would break out in Baltimore and suggested that a curfew be imposed in that city, a suggestion allegedly rejected by the Mayor. It is also stated by the appellees that the Governor and the Attorney General of the State met and discussed the legal sufficiency of proposed proclamations of a state of public emergency in Baltimore in anticipation of trouble. The measures proposed were the imposing of a curfew, banning of the sale of guns and liquor, and the activation of the National Guard.

At 8:00 P.M. on April 6, the Governor exercised the emergency powers vested in him by Chapter 70 of the Acts of 1968 (Code (1971 Repl. Vol.) Art. 41, § 15B). The National Guard was ordered to active duty and given federal status at 10:00 P.M. the same evening. Thereafter, control over the citizens of Baltimore, in our opinion, lay in the hands of the Governor of the State. See particularly Code, Art. 41, § 15B (e) subtitled, "Militia Forces."

In view of all this we think it is for the trier or triers of facts to determine just what action the City could or should have taken, if any, in the exercise of "reasonable diligence" to prevent or contain the situation. At the risk of being repetitious we again state that it will be necessary for the lower court hearing the case to bear in mind that, although the powers of a conservator of the

peace and the power to raise a "posse comitatus" still exist, the evidence may show that their use would have been futile or not within the realm of "reasonably diligent" action. The court will also have to keep in mind that the City may not be responsible for the actions or omissions of the police department or of the National Guard over which it had no control, or responsible for any control over the citizens after the Governor's proclamation of a public emergency and the calling out of the National Guard. *Altvater v. Baltimore, supra.*

The City also argues that any refusal or failure of the Mayor to have requested at an earlier stage that the Governor call out the National Guard comes under the classification of a discretionary act by a city official, in the exercise of his judgment, from which the City enjoys municipal immunity, citing *Cumberland v. Turney,* 177 Md. 297, 314, 9 A. 2d 561 (1939) ; *Hitchins v. Frostburg,* 68 Md. 100, 109, 11 A. 826 (1887) ; *Westminster Investing Corp. v. G. C. Murphy Co.,* 296 F. Supp. 1300 (D.D.C. 1969), *aff.* 434 F. 2d 521 (D.C. Cir. 1970) ; *Susman v. City of Los Angeles,* 75 Cal. Reptr. 240 (1969) ; *A & B Auto Stores v. Newark,* 256 A. 2d 110 (N.J. 1969). This argument might have some validity if the action against the City was bottomed on a common law remedy. Although, in the instant case the defense of the use of "reasonable diligence" is available to the City, the defense of immunity for discretionary conduct is not. We state this because the City's liability is not grounded on a common law action for tort but upon a statute, Article 82, which created the cause of action. Indeed, in *A & B Auto Stores v. Newark,* 248 A. 2d 258, 272 (N.J. 1968) the court with clarity stated, "* * * the affirmative creation of a cause of action against a municipality by the Legislature impliedly eliminates the defense of municipal immunity to that cause of action." Certainly, the construction which was given to Article 82 a hundred years ago by our predecessors in *Hagerstown v. Dechert, supra,* would bear this out, the Court stating:

" * * * The general rule that 'a municipal corporation is not liable for the mis-feasance or non-feasance of one of its officers, in respect to a duty specifically imposed by statute on the officer,' which was laid down in *Martin v. Brooklyn*, 1 Hill, 545, has no application to this case. The provisions of the Code under which the suit is brought, expressly make the corporation liable for neglect of duty on the part of the authorities or officers of the town." 32 Md. at 386.

We would add that when the Legislature enacted the "Riot Act," it did not intend to create a right which was unenforceable. The very language of the statute contemplates that there may be judicial review of the acts taken by a municipality to prevent or suppress a riot. Indeed, as we have heretofore stated, in *Dechert* the Court expressly held that the failure of the Mayor to request the assistance of a specific Justice of the Peace was evidence for the jury to consider in determining whether he had acted with "reasonable diligence."

The City also relies on *Street v. New Orleans*, 32 La. Ann. 577 (1880), emphasizing that it overruled the earlier Louisiana case, *Williams v. New Orleans*, 23 La. Ann. 507 (1871). The earlier decision (*Williams*) which is in accord with our view of the City's liability in this case, is practically on all fours with the case at bar, and a reading of the later case (*Street*) demonstrates that it is factually distinguishable and not apposite.

What we have heretofore stated compels the conclusion that Article 82 does not, as the City contends, deny it or its citizens due process, for the simple reason that the City may only be held liable if it, through its proper officials, failed to exercise with "reasonable diligence" the legitimate powers available to it. *Altvater, supra,* and *Sinclair, supra,* are clear illustrations wherein this Court recognized the extent of the City's liability.

Finally, we fail to see how Article 82 works any invidious discrimination against the City or its citizens,

whereby it or they are denied equal protection under the XIV Amendment of the Constitution of the United States. Article 82 not only establishes no unreasonable classifications among municipalities, it makes no classifications at all, treating all the various political subdivisions the same. Furthermore, if the City would have us believe that through the interplay of Article 82 with the Police Omnibus Act of 1966 invidious discrimination results, our answer is, that this Court by its decisions has been able to readily discern the extent of the City's liability within constitutional limits whenever its obligations have been affected by the provisions of The Police Acts. *Sinclair, supra,* and *Altvater, supra.*

The City in its brief makes the request that should this Court affirm the lower court's refusal to grant its motion for a summary judgment, that we not affirm the dismissal of its petition for declaratory judgment but remand the case for further proceedings within the framework of declaratory relief. We are not disposed to do this. We cannot conceive of further proceedings being pursued which would not result in an evidentiary hearing in which there would be facts in dispute. Such proceedings would, in our opinion, be an impermissible extention of the purposes of declaratory relief as contemplated under Code, Article 31A.

Judge Harris, being mindful of this Court's opinion in *Hunt v. Montgomery County,* 248 Md. 403, 410, 237 A. 2d 35 (1968), while dismissing the City's petition, nonetheless, made a declaration that Article 82 was constitutional insofar as its application to the City was concerned. In this opinion we affirm that holding. However, we think it would have been more appropriate had the lower court, instead of dismissing the City's petition, made, in its order, a declaration of the rights of the parties. Accordingly, while affirming the lower court's denial of the City's motion for summary judgment, we are remanding the case for the limited purpose of having the lower court restate its order including therein a declaration of the

rights of the parties according to the views expressed in this opinion.

> *The portion of the order denying summary judgment affirmed, case remanded for the limited purpose of having the court restate its order to include therein a declaration of rights in conformance with the views expressed in this opinion; appellants to pay costs.*