Robert Lee WILCHER

v.

R. D. CURLEY, et al.

Louis Harold RICHMAN

v.

Officer Michael Todd CALLAHAN, et al.

Civ. Nos. K–77–440, K–77–2066.

United States District Court,
D. Maryland.

June 10, 1980.

On Motion For Reconsideration July
21, 1981.

Robert A. DiCicco, and Beatrice S. Daly, Towson, Md., for plaintiff Wilcher.

Joseph F. Murphy, Jr., Carmina Szunyog, Towson, Md., for defendants Curley, Keene, Minnicks, Nevin, Schraml and Wilson.

Benjamin L. Brown, City Sol., William Hughes, Glenn M. Grossman, G. Denmead Leviness, and Otho M. Thompson, Asst. City Solicitors, Baltimore, Md., for defendant City of Baltimore.

Benjamin L. Brown, City Sol., and Millard S. Rubenstein, Asst. City Sol., Baltimore, Md., for defendant Pomerleau.

Robert C. Verderaime, Baltimore, Md., for defendants Sharp, Kelly and Callahan.

Harold I. Glaser, and Stanley Kantor, Baltimore, Md., for plaintiff Richman.

Benjamin L. Brown, City Sol., James L. Prichard, Glenn M. Grossman, Otho M. Thompson, and J. Warren Eberhardt, Asst. City Solicitors, Baltimore, Md., for defendant Mayor & City Council.

FRANK A. KAUFMAN, Chief Judge.

In these two cases, two of the defendants, the Police Commissioner of Baltimore City (Commissioner) and the Mayor and City Council of Baltimore (City) seek summary judgment in response to the § 1983 claims of the two plaintiffs. In one of these cases, *Richman v. Callahan, et al.*, Civil No. K–77–2066 (Richman), plaintiff seeks compensatory and punitive damages from Baltimore City Police Officer Callahan, the Commissioner, and the City. Richman alleges, *inter alia*, that Callahan chased Richman without probable cause so to do, discharged his gun twice at Richman while pursuing him, and then restrained and battered Richman with excessive force and malice, and that the Commissioner and the City had failed to train Callahan properly. In *Wilcher v. Curley, et al.*, Civil No. K–77–440, plaintiff, a citizen of Maryland, seeks compensatory and punitive damages from Baltimore City Police Officers Curley, Keene, Minnicks, Nevin, Schraml, Wilson, Blackburn and Markowski of the Baltimore City Police Department (Department), the Commissioner, and the City.[1] Wilcher alleges that the defendant police officers, without provocation or cause, beat Wilcher severely and thereafter unlawfully held him in their custody. Wilcher further alleges that the Commissioner, knowing of the reputation of the defendant officers for brutality, had negligently failed to discharge them.[2] The

---

1. Wilcher originally included two additional defendants, Sharp and Kelly. The claims against both of those defendants have since been dismissed without objection by any of the parties in that case.

2. Wilcher additionally alleges that the Commissioner hampered Wilcher's efforts to seek redress against the police officers after the incident had occurred, and that by such actions the Commissioner violated certain provisions of the Baltimore City Code. That issue is not decided herein at this time and will require

City and the Commissioner seek summary judgment[3] in both of the two cases.[4]

In *Richman*, the Commissioner contends that Richman has alleged no facts to show that he (the Commissioner) was directly involved in the incident, that the Commissioner was and is an official of the State of Maryland (State) and not of the City, and that the Eleventh Amendment bars the monetary relief requested in *Richman*. The City argues in *Richman* that no city personnel were involved in the incident, that, since Baltimore City police officers are state personnel, the police commissioner is a state and not a city official, that the City is not a person within the meaning of 42 U.S.C. § 1983,[5] and that the action complained of involved a personal tort by a police officer, and is not actionable under § 1983.

In *Wilcher*, the Commissioner and the City contend that they are agencies of the state. The Commissioner and the City also contend that the affidavits filed on behalf of the Commissioner and the City disclose that the Commissioner performed his duties in the selection, training, supervision, and discipline of the defendant police officers, and that the Commissioner was not himself involved in the incident.

### State/City Issue

The threshold question presented in both of the cases dealt with herein [5A] is whether the Commissioner is a state or city official, and whether the Baltimore City Police Department is a state or city agency. All parties seemingly agree that if they are "state" rather than "city" agencies, the

Eleventh Amendment bars recovery against them in their official capacities.

In *Patterson v. Ramsey*, 413 F.Supp. 523 (D.Md.1976), *aff'd* 552 F.2d 117 (4th Cir. 1977), Judge Young, after examining the statutory scheme governing the Board of School Commissioners of Baltimore City determined (at 530) that

the Board is a hybrid creature. It is established by the City pursuant to power delegated by the State. It receives most of its powers from the City, but is regulated in certain limited operations by the State. It receives its funds from both the City and the State. On balance, however, the Board is an agency of the City rather than an alter ego of the State. As such, it can be sued without offense to the Eleventh Amendment.

■ Herein the record establishes:

(1) The City determines the amount of revenue to be allocated for the Department and provides about two-thirds of that revenue. The remaining third comes from the State.

(2) The number of employees the police department has from time to time depends upon the funds made available by the City and upon the Commissioner's determination of the number of employees those funds can adequately compensate.

(3) All employees of the Department are paid directly by the City, and are covered by the same medical and hospital insurance as that which is available to employees of the City in general.

---

further clarification and briefing if Wilcher is pursuing it.

3. Any motions to dismiss filed by those two defendants are treated herein as summary judgment motions in view of documents in addition to pleadings filed herein. *See* Federal Civil Rules of Procedure 12 and 56.

4. In both cases, plaintiffs set forth various state causes of action, such as false imprisonment, in addition to their § 1983 claims. There claims are not discussed herein.

5. That contention was effectively eliminated by the decision of the United States Supreme Court in *Monell v. Department of Social Serv-*

*ices*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

5A. These two cases both present the identical threshold legal question: whether the Department and its Commissioner are state or city agencies. The legal principles involved in resolving the two summary judgment motions are likewise identical although the facts of the two cases are different. Thus, these two cases are hereby consolidated, pursuant to Federal Civil Rule 42(a), solely for the resolution of the motion questions dealt with herein.

(4) The Commissioner reports to the Mayor and to the City Council on a regular and also on an as-needed basis.

(5) The estimates by the Commissioner of the amount of money needed to fund the Department, review of those estimates, and subsequent appropriations are subject to the same fiscal policies and procedures as are applicable to other municipal agencies.

(6) The Civil Service Commission of Baltimore, a City agency, conducts examinations for positions in the police department and supplies the Commissioner with a list of candidates.

(7) The Commissioner reports at certain intervals to the Governor of the State of Maryland (Governor), to the Mayor of the City of Baltimore, and to the Baltimore City Council (City Council). He also submits to the City Council a mid-year fiscal report on Department operations.

(8) The Commissioner rarely consults with the Mayor. Before July 1, 1979, the Commissioner frequently consulted with the Assistant Attorney General of Maryland who, up to that time, acted as counsel to the Department. Since July 1, 1979 the Commissioner has been represented by the City Solicitor for Baltimore City.

(9) The salary of employees of the Department is set by the Mayor and City Council. Employees of the Department other than the Commissioner are paid by the City. The Commissioner receives $45,-000 per annum, $15,000 of which is paid by the State.

(10) Department contracts are made and executed in the name of the City.

(11) The Mayor appoints the Commissioner and has the power to remove the Commissioner. Such power to appoint and to remove was given to the Mayor by the

Maryland legislature in 1976 by certain statutory amendments to Section 16–5 of the Code of Public Local Laws of Baltimore City which became effective July 1, 1976.[6]

(12) The Baltimore City Local Laws, section 16–2(a) declares that the "Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland." However, that declaration is not in itself determinative of whether the Department is a city or a state agency for § 1983 purposes since state and local law are only one of several indicators of an agency's status. *See Patterson v. Ramsey*, 413 F.Supp. at 529.

■ In *Vanguard Justice Society, Inc. v. Hughes*, 471 F.Supp. 670 (D.Md.1979), in which the question was presented as to whether the City is an "employer" for the purposes of a suit brought against it under 42 U.S.C. § 2000e (Title VII), this Court (at 689–92 & n.51) extensively reviewed the history and the status of the Department. That review and the above set forth facts require the same conclusion herein as to the Department and as to the Commissioner as Judge Young reached with regard to the City School Board in *Patterson*, namely, that the Department and the Commissioner in his official capacity can be subjected to damage awards without offending the Eleventh Amendment.

While the Department and the Commissioner are hybrid creatures, the City exercises such substantial control over the day-to-day activities and policies of the Department that if there was something major amiss in the Department in the time period involved in these cases the City and/or the Commissioner either would or should have known about it, and would or should have taken steps toward cure of the same. As

---

**6.** The 1976 Amendment did not affect the term of Commissioner Pomerleau who was then in office. That term ended on July 1, 1978, at which time Commissioner Pomerleau was reappointed. *Vanguard Justice Society, Inc. v. Hughes,* 471 F.Supp. 670, 689 & n.48 (D.Md. 1979). The incident involved in *Richman* allegedly occurred on March 24, 1977; the incident in *Wilcher* on September 11, 1976. Thus,

when the incidents complained of herein took place, the Commissioner was completing a term to which he had been appointed by the Governor. However, the requirement noted *supra* of annual report to the Governor was seemingly eliminated effective July 1, 1976; after that the Commissioner was only required to report to the Mayor and City Council. *Id.* at 692.

Judge Young suggests in *Patterson v. Ramsey, supra,* nothing more is required to eliminate the Eleventh Amendment bar. Accordingly, the motions of the City and the Commissioner to dismiss these cases as to them on the grounds that those defendants are state and not city connected must be denied.

### Merit Issues

In *Richman,* the City and the Commissioner assert that the undisputed facts reflect that adequate training and supervision procedures existed at the time of the incident complained of and continue to exist, that those two defendants did not participate in the deprivation, if any, of plaintiff's rights and that therefore they are entitled to summary judgment. *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, in response Richman contends that Officer Callahan had used excessive force both before and after the incident complained of herein, and that Callahan had never been disciplined for participating in any of those incidents. Richman also claims that Callahan had a temper problem and was known to have such a problem at the time that he was hired, but that no action was taken either in terms of not hiring him or in terms of placing him in positions in which his temper would not cause a problem. Richman, in sum, asserts that the Commissioner and City inadequately supervised the police department, that they knew or should have known that individuals such as Officer Callahan were improperly screened, that they knew or should have known that officers were not disciplined for use of excessive force (whether because procedures were inadequate or because existing rules were not enforced), that the failure of the Commissioner and the City to have adequate procedures or to punish violators of existing rules caused police officers such as Callahan to believe that they could use excessive force with impunity, and that the fact that Callahan allegedly used excessive force on *numerous* occasions and was not disciplined therefor substantiates the above assertion and the failure of the Commissioner and the City to protect the constitutional rights of Richman.

In *Wilcher,* the City and the Commissioner similarly assert that the Commissioner had properly performed his duties in selecting, training, supervising, and disciplining the police officer defendants, and that neither the City nor the Commissioner participated in the incident complained of by Wilcher. Wilcher, on the other hand, contends that the Commissioner knew or should have known that police officers from the same district as the defendant officers had been involved in repeated instances of abuse such as the incident complained of, and that the Commissioner took no action in response to the problem posed by those repeated complaints. Wilcher further claims that there had been complaints lodged against the officers involved herein, and that the Commissioner knew or should have known of the problems existing in the district wherein the police officer defendants worked. Wilcher argues that the lack of remedial action on the part of the Commissioner and the City—which latter entity exercised, plaintiff alleges, at least some control over the former—was at least partly the cause of the pattern of violations of which the incident complained of in *Wilcher* formed a part.

In *Withers v. Levine,* 615 F.2d 158, 161–62 (4th Cir. 1980), Chief Judge Haynsworth wrote as follows (emphasis added):

The defendants have not contended that an action under § 1983 might not be founded upon simple negligence in light of the nature of this [prisoner] claim and the constitutional right upon which it is founded. In light of the recurrent broad contentions to that effect, however, the matter deserves a word. * * *

* * * [T]he question is not susceptible to a broad answer. Before one becomes concerned with the nature and the quality of the wrong, one must first look for the constitutional right, protection of which is sought, and the kind of protection which is required. Surely the Constitution of the United States does not

lend its protection to every victim of a common law tort by state officials and employees. * * * But negligence by a state official under some circumstances may itself violate a constitutionally protected right; when it does, it is actionable under § 1983. [Citation omitted.]

When there is present in a prison or in an identifiable portion of it, a pervasive risk of harm to all prisoners, or to an identifiable group of them, the constitutional prohibition against cruel and unusual punishment requires that prison officials exercise reasonable care to provide reasonable protection from such unreasonable risk of harm. *Given the pervasive and unreasonable risk of harm, negligence by prison officials in their performance of their duty of care is a violation of the constitutional right and actionable under § 1983.* The constitutional right would often remain unredressed if a higher standard of care were required. [Emphasis added.]

In *McClelland v. Facteau,* 610 F.2d 693, 697–98 (10th Cir. 1979), Judge Logan, reversing in part the trial court's granting of summary judgment for the defendant [police chiefs], wrote:

* * * We agree with those courts that have found a cause of action under section 1983 when the defendant was in a position of responsibility, knew or should have known of the misconduct, and yet failed to act to prevent future harm. [Citations omitted.] We find that there is a genuine issue of fact whether defendants breached this duty.

The rules and regulations cited of both police hierarchies indicate that the immediate and direct duty to supervise has been delegated, but the police chiefs have retained the ultimate responsibility for what goes on in the departments. The perimeters of their duty are uncertain and must be determined at trial.

In order to establish a breach here, plaintiff must show that the defendant was adequately put on notice of prior misbehavior. Although both Schmerheim and Vigil denied any knowledge of wrongdoing by the three subordinates, McClelland countered by tendering newspaper articles and affidavits indicating it was well known that rights were being violated in the Farmington jail and by state police officer Facteau, and showing Schmerheim was a party in two law suits involving the deaths of prisoners incarcerated in Farmington jail. Distant rumors that are too vague to prompt action by reasonable persons, or information that is reasonably believed to lack credibility do not provide sufficient notice. [Citation omitted.] We hold, however, that McClelland's showing was adequate to raise an issue of fact on the sufficiency of notice because the accusations contained in the material were recent and serious. * * *

If any inferences can be drawn from the facts that might allow recovery from defendants, then summary judgment is not appropriate. [Citations omitted.] If publicity of police misconduct was widespread and credible it may be inferred police chiefs who admitted reading the daily newspapers knew of it. They had ultimate responsibility for what went on in the departments, and it might be found they should and could have taken steps that would have prevented the deprivation of McClelland's rights. Defendants can, of course, refute these inferences at trial, but we cannot hold that they are entitled to judgment now as a matter of law.

In *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), Judge Smith, reversing the trial court's grant of judgment for the defendant county on the pleadings, stated that a—

mere failure by the county to supervise its employees would not be sufficient to hold it liable under § 1983. *Rizzo v. Goode,* 423 U.S. 362 [96 S.Ct. 598, 46 L.Ed.2d 561] * * * (1976). However, the county could be held liable if the failure to supervise, if the lack of a proper training program was so severe as to reach the level of "gross negligence" or "deliberate

indifference" to the deprivation of the plaintiff's constitutional rights. *Leite v. City of Providence,* 463 F.Supp. 585, 590–91 (D.R.I.1978); [citation omitted]. This concept of "deliberate indifference" does not hold the county at fault for the actions of its employees on a *respondeat superior* basis; it holds the county liable for its *own* actions which result in deprivation of constitutional rights. [Citations omitted.] [Emphases in original.]

\* \* \* \* \* \*

The district court rejected liability for the county, in part, because plaintiff "asserts here not a repeated course of conduct, but only an isolated incident." [Citation omitted.] While some causal link must be made between the county's failure to train and the violation of constitutional rights, a single brutal incident such as this may be sufficient to suggest that link. As noted in *Leite, supra,* 463 F.Supp. at 590–91:

> Although a city cannot be held liable for simple negligent training of its police force, the city's citizens do not have to endure a "pattern" of past police misconduct before they can sue the city under section 1983 .... [A] municipality is fairly considered to have actual or imputed knowledge of the almost inevitable consequences that arise from the non-existent or grossly inadequate training and supervising of a police force.

*See,* in addition, *Smith v. Ambrogio,* 456 F.Supp. 1130, 1135–37 (D.Conn.1978). In the within cases, plaintiffs have alleged that there was a pattern of constitutional violations, and that the inaction of the City and the Commissioner allowed that pattern to continue. Plaintiff in *Richman* contends that Officer Callahan had himself been involved in numerous incidents where excessive force had been used, and that Callahan had never been disciplined for his participation in those incidents and has submitted documents in support of those contentions. Plaintiff in *Wilcher* asserts that there was a pattern of constitutional violations in the district where the police officer defendants worked and has submitted documents in support of that assertion. Under *Withers, Owens* and *McClelland,* such preliminary showings suffice to get the plaintiffs herein past the summary judgment motions of the City and the Commissioner. Whether or not the Commissioner and/or the City knew of the patterns asserted by plaintiffs (if those patterns existed), and failed to take corrective action and assert control, and whether or not, in any event, any actions or inactions of the Commissioner and/or the City caused the incidents complained of herein, are questions for determination at trial.

Thus, the summary judgment motions of the Commissioner and the City, on the merit issues, must be denied.

## ON MOTION FOR RECONSIDERATION

The facts of these cases are set forth in an earlier opinion, (See page 2), in which the motions of the Police Commissioner of Baltimore City (Commissioner) and the Mayor and City Council of Baltimore (City) for summary judgment were denied. Thereafter, the City sought reconsideration of the denial of its motion, contending that even if the City is not entitled to summary judgment because the Baltimore City Police Department may be a City agency for certain purposes, the City is not liable for the alleged actions of the Baltimore City Police Officers in these cases because in these cases the police officers were acting as State employees rather than City employees and therefore the City's actions, as alleged by plaintiffs, had no causal link with those alleged actions.[1]

The relationship between the City and the Police Department is set forth at length in the said June 10, 1980 opinion in this case

---

1. As to liability under 1983 of cities for police misconduct, *see generally* Kramer, "Section 1983 and Municipal Liability: Selected Issues Two Years After *Monell v. Department of Social Services,*" 12 Urban Lawyer 232, 244 *et seq.* (1980). *And see,* in addition to the cases cited in this Court's June 10, 1980 opinion, *Parratt v. Taylor,* —— U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Redmond v. Baxley,* 475 F.Supp. 1111, 1116 (E.D.Mich.1979).

at pages 3–7, and in *Vanguard Justice Society v. Hughes*, 471 F.Supp. 670, 689–92 (D.Md.1979). *In Mayor and City Council of Baltimore v. Silver*, 263 Md. 439, 450–51, 283 A.2d 788 (1971), *appeal dismissed*, 409 U.S. 810, 93 S.Ct. 38, 34 L.Ed.2d 65 (1972), Judge Finan commented:

> * * * [C]ontrol of the [police] department is vested in the State with immediate supervision and direction of the department under a police commissioner who is appointed by the Governor. Further support for the autonomy of the police department is found in Article 2, Section 27 of the Charter of the City which provides that, "[N]o ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder, or interfere with the powers of the Police Commissioner."

> However an appreciation of the relationship between the City and the police department cannot be fully grasped unless it is understood that the City is the agency responsible for appropriating money for the operation of the police department and that the police commissioner must annually appear before the Board of Estimates of the City to defend his budgetary requests. Section 533(a) Chapter 203 of the Acts of 1966. Certainly, although this in itself could not be construed as a method of indirect control over the police department by the City, nonetheless one would be overly naive not to think that such a situation would provide the occasion for the flow and exchange of communications, accommodations and cooperative action between the City and the police commissioner. [Footnote omitted.]

*See also* Note, 33 Md.L.Rev. 73, 84 (1973) ("The Police Commissioner could also ignore the suggestions of the Mayor with impunity, subject only to the threats of future budgetary restraints or retaliation.").[2]

---

**2.** Prior to the incidents alleged in these cases, the Maryland Legislature amended the Baltimore City Local Laws to transfer the power to appoint the Commissioner to the Mayor, subject to confirmation by the City Council. *See*

In an affidavit filed herein on September 12, 1980, Commissioner Donald D. Pomerleau stated:

> Pursuant to state law, no official of the City of Baltimore is responsible for the training, discipline, promotion, discharge and procedure of the members of the Baltimore City Police Department.

> Since 1966, when I was appointed Police Commissioner, the appointing authorities, Governor of Maryland and Mayor of Baltimore, have not, in fact, acted in any way to direct the management or operation of the Baltimore City Police Department.

> No official of the City of Baltimore has, in fact, interfered with or sought to direct the management of the Baltimore City Police Department.

> The City's responsibility to the Department of a fiscal nature and the actual level of funding of the Department have had no effect on any decision to take disciplinary action against any individual police officer, nor have they had any effect on the procedures used to determine the necessity for disciplinary action or the outcome of such action.

> Persons appointed Baltimore City Police Officers are thoroughly screened and trained by methods within the Police Department and by psychological tests conducted by an outside non-governmental psychological firm. * * * I appoint those persons qualified to become Police Officers including the Police Officer defendants in these two cases. Although the Baltimore City Civil Service Commission supplies me with a list of candidates, the ultimate selection of officers and their retention is a matter for my ultimate discretion within the limits prescribed by law.

In an additional affidavit filed March 24, 1981, Commissioner Pomerleau stated:

> The training received by Baltimore City Police Officers is in full compliance

---

*Vanguard Justice Society v. Hughes, supra* at 689. However, that change did not become effective until after the events of which plaintiffs complain.

with, and, exceeds the standards set for training by the Maryland Police Training Commission pursuant to Maryland Annotated Code, Article 41, Section 70 A.

\* \* \* \* \* \*

Funds for all \* \* \* training activities as well as for periodic opportunities to allow individuals or groups to take advantage of specialized training offered by other agencies, have been included as part of the Police Department's Budget in every year since I have become Police Commissioner. Such funding by the City of Baltimore has always been entirely adequate for all the types of training undertaken. To the best of my knowledge, the training activities of the Police Department prior to my tenure were fully funded by the City of Baltimore.[3]

Commissioner Pomerleau's affidavits are uncontradicted. Plaintiffs have filed no Federal Civil Rule 56 material stating or implying that the City exercised some control over the police officers involved in these cases, in connection with the events plaintiffs allege.

In *Mayor and City Council of Baltimore v. Silver, supra,* the Court of Appeals of Maryland determined that the City might be liable under the Maryland Riots Act for damages suffered during riots following the death of Martin Luther King. In *Silver,* Judge Finan noted the power of the Mayor to raise a "posse comitatus" (263 Md. at 449, 283 A.2d 788) and, even with "no authority over the police department" (at 452, 283 A.2d 788), authority to take "various courses of action" as "a conservator of the peace." (id.) Judge Finan wrote in *Silver* in a summary judgment context. In these two cases, the issues are similarly presented. But herein, even giving plaintiffs in both cases the benefit of all factual inferences, there is nothing in the records in these cases to suggest that either plaintiff suffered any injury because the City failed to provide sufficient funds for the operation of the police department, or failed to take any action. The City, as discussed *supra,* exercised only in a limited way any direct or indirect control over the Baltimore City police department, and did not possess or exercise any control whatsoever relating to the actions or lack of actions complained of by plaintiffs in these two cases. Thus, the records in these cases uncontrovertibly demonstrate that the City did not contribute to or cause the injuries of which plaintiffs respectively complain. Whether or not the Police Commissioner or any of the other defendants herein other than the City did or did not cause any injury to either plaintiff presents viable issues of fact. But no such issues are presented insofar as the City as an entity is concerned. Accordingly, the City's motions for reconsideration and for summary judgment are soundly based. Thus, the City is entitled to summary judgment in both of these cases. Separate Orders entering such judgments will therefore be entered in favor of the City in these two cases.

---

3. *See also* the deposition of Commissioner Pomerleau, taken on June 26, 1978.