944 A.2d 1122

**MAYOR & CITY COUNCIL OF BALTIMORE, et al.**

v.

**Kevin P. CLARK.**

**No. 68 Sept. Term, 2006.**

Court of Appeals of Maryland.

March 20, 2008.

---

Ralph S. Tyler, City Sol. (Joshua N. Auerbach, Asst. City Sol., Baltimore City Dept. of Law, on brief), Baltimore, for petitioners.

Neal M. Janey (Stuart O. Simms and A. Dwight Pettit, on brief), Baltimore, for respondent.

ARGUED BEFORE BELL, C.J., RAKER, CATHELL*, HARRELL, BATTAGLIA and GREENE, JJ., and ALAN M. WILNER, J. (Retired, specially assigned).

BELL, Chief Judge.

The Appointment, term, and qualifications of the Police Commissioner of Baltimore City are prescribed by § 16–5(a)

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

of the Code of Public Local Laws of Baltimore City (1997 Edition).[1] As relevant, that section provides:

"The Police Commissioner of Baltimore City shall be appointed by the Mayor of Baltimore City, subject to confirmation by the City Council by a majority vote of its members, for a term of six years, the first term to commence July 1, 1978, and continue until a successor is appointed and qualified as herein provided, but no person is eligible for the appointment unless that person is a citizen of the United States, not less than 30 years of age, and has not had less than five years' administrative experience that is sufficiently broad, responsible and technical to prepare that person to function effectively at the desired level as police commissioner."

The removal of the Police Commissioner of Baltimore City is addressed in § 16–5(e), which provides:

"The Police Commissioner is subject to removal by the Mayor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers."

As the reasons enumerated make clear, the Code of Public Local Laws contemplates that removal of the Police Commissioner be "for cause."

The respondent, Kevin P. Clark[2] (hereinafter "Clark" or "the respondent"), in 2003 was appointed the Police Commissioner of Baltimore City by the Mayor of the City of Baltimore (hereinafter "Mayor") and confirmed by the City Council. Prior to his confirmation, Clark and the Mayor entered into a contract, denominated "Memorandum of Understanding" (MOU), "to employ the services of Clark as the Police Com-

---

1.  Future references to a section of the Code of Public Local Laws will be to this edition, unless otherwise noted, and will be cited as "PLL § 16–5."

2.  Kevin Clark was a former Commander in the New York Police Department.

missioner of Baltimore City." [3] The contract, which purported to be for "the remaining term of the last Commissioner until June 30, 2008," addressed the terms and conditions of Clark's employment as Police Commissioner. One term related to his removal as Commissioner. Albeit in the context of "Additional Compensation/Severance Pay," the parties acknowledged, in Section 2. A. of the MOU,[4] the applicability of PLL § 16–5(e) to the removal of the Commissioner and denied any intention to "affect the rights of the Mayor in that respect." In another section, however, the agreement introduced and prescribed another method of removal, one not contemplated or addressed in the Code of Public Local Laws, termination without cause. Section 12. of the MOU provides:

> "Either party may terminate this contract at any time, by giving forty-five (45) days prior written notice to the other. Notwithstanding the above sentence the provisions of Section 2B [5] remain in force."

---

**3.** The parties suggest that the contract was negotiated and, perhaps, consummated prior to Clark's formal appointment. In its brief, the City states that the contract was negotiated by Clark, represented by counsel, "[i]n early 2003," and finalized "[i]n February 2003." Clark's brief reports that he was "nominated" for the position and that the contract was entered into "[w]hile awaiting formal appointment and confirmation."

**4.** Section 2.A. provides:
> "The Commissioner recognizes that he may be terminated by the City pursuant to the removal provisions by the Mayor in Baltimore City Code of Public Local Laws (§ 16–5[e]) and nothing in this Agreement shall affect the rights of the Mayor in that respect. However, except as stated in Section 3 and for just cause as defined below, Clark shall be entitled to receive the additional compensation/severance pay as provided in Section 2.B. of the agreement regardless of the reasons for the termination of employment by the Mayor or City. Just cause for the purpose of this section shall be defined as:
> "(1) Gross dereliction of duty; as to any one incident or series of conduct.
> "(2) Illegal use of intoxicants or drugs; or
> "(3) Indictment of a felony or any other crime involving moral turpitude or theft."

**5.** This paragraph delineates the circumstances under which Clark would be entitled to "additional compensation/severance" pay. The circumstances enumerated were:

Clark commenced his role as Police Commissioner following the signing of the MOU. A little more than a year and a half later, on November 10, 2004, however, "pursuant to Sections 12 and 13 of the Memorandum of Understanding," he was relieved of his command.[6] The letter providing the requisite forty-five days notice of the termination of the MOU and, thus, terminating his tenure as Police Commissioner, was delivered to Clark by the City Solicitor, and, as relevant, advised:

"This notice is sent on behalf of the Mayor and City Council of Baltimore (the "City") pursuant to Sections 12 and 13 of the Memorandum of Understanding ("MOU") between you and the City dated February 19, 2003. This notice shall serve as the City's 45–day notice of termination of your employment. Thus, your employment shall terminate 45 days from today. However, as the Mayor announced this morning, you have been relieved of all official duties as of 8:30 a.m., November 10, 2004, and therefore, your further access, if any, to Police Department facilities, equipment, or documents will be subject to the specific, prior authorization of Acting or Interim Police Commissioner Hamm."

Clark filed, in the Circuit Court for Baltimore City, a verified complaint, naming as defendants, Mayor Martin O'Malley and the Mayor and City Council of Baltimore[7], in

---

"(1) [Clark is] terminated in the Initial Term by the City for any reason other than for just cause as defined in Paragraph 2.A.; . . . (2) . . . Clark is forced to resign following a formal or informal suggestion by the Mayor that he resign; . . . (3) . . . Clark's salary is reduced below his present annual salary without Clark's written consent; . . . (4) . . . [Without] just cause as [defined in Paragraph 2.A.,] the Mayor does not reappoint and the Council confirm the reappointment of Clark to a full six-year term immediately following the Initial Term."

6. The notice that he had been relieved of command came after the fact. It came after a detail of Baltimore City Police Department's SWAT (Special Weapons and Tactics Team) Unit had occupied the respondent's office and while the Mayor was holding a news briefing at which he reported that Commissioner Clark had been relieved of command.

7. The Mayor and City Council, though not initially named as a defendant, was added as a defendant in the respondent's First Amended Complaint.

which, in addition to seeking reinstatement as Police Commissioner and monetary damages, he requested declaratory and injunctive relief. After some preliminary skirmishing, consisting of the denial of injunctive relief and the denial of the petitioner's dispositive motion for summary judgment, Clark filed an amended complaint. In response, the petitioner again moved for summary judgment. Following a hearing, the Circuit Court granted summary judgment to the petitioners, concluding that the MOU was a valid and unambiguous contract, pursuant to which Clark had been lawfully terminated, upon notice properly given pursuant to paragraphs 12 and 13 thereof. The Circuit Court also issued a declaratory judgment, in which, consistently, it declared that the Mayor properly had terminated Clark, without cause, on proper notice. Clark immediately noted an appeal to the Court of Special Appeals.

The intermediate appellate court reversed the judgment of the Circuit Court. *Clark v. O'Malley,* 169 Md.App. 408, 901 A.2d 279 (2006). Concluding that the trial court erred in holding, as a matter of law, that the MOU was valid and enforceable, it held that the Mayor did not have the authority to remove a Police Commissioner pursuant to a contract providing for removal without cause, the Mayor's ability to remove the Police Commissioner having been limited by the General Assembly, 169 Md.App. at 439, 901 A.2d at 297, and, therefore, the removal provisions of the MOU were invalid. The Mayor and the Mayor and City Council of Baltimore timely filed a petition for writ of certiorari with this Court, which we granted. *Baltimore v. Clark,* 395 Md. 56, 909 A.2d 259 (2006).[8]

### A.

The arguments advanced by the petitioners to challenge the judgment of the Court of Special Appeals are multi-faceted.

---

**8.** The question thus presented is whether Kevin Clark is "bound by the unambiguous 'right to terminate without cause' provision in the employment contract that he negotiated with the City of Baltimore?"

First, noting that the parties in fact entered into an employment relationship via contract, in which there was "an extensive set of . . . promises that each made to the other" and, particularly, that Clark was represented by counsel of his choice throughout the process, they argue that "public policy" is not a valid basis for invalidating the provisions of the contract at issue in this case. This is so, the petitioners submit, because of "the profound importance of permitting individuals to 'exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle,' " citing and quoting *Maryland–National Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 606, 386 A.2d 1216, 1229 (1978), and because " 'Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, *doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where "the common sense of the entire community would . . . pronounce it" invalid.* ' " *Id.*, quoting *Estate of Woods, Weeks & Co.*, 52 Md. 520, 536, 1879 WL 4349, *8 (1879) (emphasis added).

Next, the petitioners acknowledge that Section 16–5(e) of the Public Local Laws of Baltimore City prescribes a list of enumerated causes for which the Baltimore City Police Chief "is subject to removal," but they do not concede that the section or the enumeration is dispositive. The petitioners argue, instead, that

> "[t]he provision does not . . . prohibit the City from entering into a contract with a prospective police commissioner that contains terms of removal additional to those that it identifies. In other words, § 16–5(e), by its terms, establishes a baseline ('is subject to removal'). The statutory provision is not prohibitive, nor does it abolish parties' right to contract."

This is particularly the case, they posit, noting the Court of Special Appeals' characterization of the pertinent contractual provision as "expand[ing] the Mayor's removal authority," *Clark*, 169 Md.App. at 439, 901 A.2d at 297, when there is no

"actual conflict" between the statutory and contractual provisions. The petitioners rely on *Stearman v. State Farm Mut. Auto. Ins. Co.*, 381 Md. 436, 455–57, 849 A.2d 539, 550–52 (2004) and *State Farm Mut. Auto. Ins. Co., v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 637, 516 A.2d 586, 589 (1986), Maryland cases in which this Court refused to invalidate an exclusion that was not expressly authorized by statute, and *County of Giles v. Wines*, 262 Va. 68, 546 S.E.2d 721, 723 (2001); *Thompson v. Adams*, 268 F.3d 609, 612–13 (8th Cir. 2001).

The petitioners also argue that, "even if the Court were to accept Clark's interpretation of [Public Local Law, § 16–5(e)], the Court should be dubious of a claim that a provision of the Public Local Laws reflecting the specific concerns of antebellum and Civil War-era governance in Baltimore accurately reflects the current 'public policy' of the City or the State." Noting the office of a public local law is to address a matter of governance peculiarly local in nature, quoting *Norris v. Mayor & City Council of Baltimore*, 172 Md. 667, 681, 192 A. 531, 537–38 (1937), and that such laws, by constitutional provision, may be repealed and amended by the Mayor and City Council, Maryland Constitution, Article XI–A, § 3,[9] they suggest that

---

9. Subject to provisos, not here relevant, Maryland Constitution, Article XI A, § 3 provides, as pertinent:

"From and after the adoption of a charter by the City of Baltimore, or any County of this State, as hereinbefore provided, the Mayor of Baltimore and City Council of the City of Baltimore or the County Council of said County, subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws of said City or County including the power to repeal or amend local laws of said City or County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided, and, as expressly authorized by statute, to provide for the filling of a vacancy in the County Council by special election; provided that nothing herein contained shall be construed to authorize or empower the County Council of any County in this State to enact laws or regulations for any incorporated town, village, or municipality in said County, on any matter covered by the powers granted to said town, village, or municipality by the Act incorporating it, or any subsequent Act or Acts amendatory thereto[.]"

the contractual provision may well be "a more accurate reflection of current public policy."

Decrying the respondent's argument that, because the Baltimore City Police Department is a State, rather than a City, agency, the Police Commissioner may be removed only for "official misconduct, malfeasance, inefficiency or incompetency," as amounting to anti-democratic, anti-civilian control, the petitioners finally urge that it be given "especially close scrutiny." More particularly, they submit:

"It is of course true, as the Court of Specials recognized, that the Baltimore Police Department remains an agency of state government for many state law purposes. *See, e.g., Clea v. Mayor & City Council of Baltimore*, 312 Md. 662[, 668, 541 A.2d 1303, 1306] (1988); *Baltimore Police Dept. v. Cherkes*, 140 Md.App. 282[, 303–04, 780 A.2d 410, 422–23] (2001). But it is also true, as a matter of now long-standing practice, that the State undertakes virtually no oversight or supervision of the Police Department. This is not a criticism of the State. The disappearance of oversight by the State became an essentially unavoidable reality after (1) in 1966, the City became the agency of government responsible for appropriating money for the operation of the police department, *see Mayor & City Council v. Silver*, 263 Md. 439, 450–51[, 283 A.2d 788, 794] (1971); and (2) in 1976, the Mayor became responsible for appointing the Police Commissioner, *see Clea*, 312 Md. at 669[, 541 A.2d at 1306]. What remained, particularly after 1976, was an institutional configuration in which only city government could effectively and meaningfully oversee the Police Department.

"The deeply troubling (as well as anti-democratic) consequence of Clark's argument, if accepted by this Court, is that the Police Commissioner will not be subject to any meaningful civilian control or oversight. City government would be blocked from overseeing the Department. It would be unrealistic to expect that the State would return to fill the void."

Article XI–A of the Maryland Constitution authorizes counties within Maryland and Baltimore City to elect a "charter

board" and to "prepare . . . a charter or form of government," through which that board is to act. Md. Const. art. XI–A, § 1. These charters, as adopted, "become the law of said City or County, subject only to the Constitution and Public General Laws of this State, and any public local laws inconsistent with the provisions of said charter and any former charter of the City of Baltimore or County shall be . . . repealed." Md. Const. art. XI–A, § 1.

The Charter of Baltimore City ("Charter"), most recently ratified in 1994, provides that "[e]xcept as otherwise provided in the Charter, the Mayor shall have the sole power of appointment of all municipal officers, subject to confirmation by the City Council by a majority vote of its members" Charter, art. IV, § 6(a). The same article also provides that:

"The Mayor shall have the power to remove at pleasure all municipal officers, except members of boards and commissions established by Charter or other law, appointed by the Mayor in the manner prescribed in this section and confirmed by the City Council; provided, however, that appointees holding office pursuant to the provisions of the Charter relating to the Civil Service may be removed from office only in accordance with such provisions."

Charter, art. IV, § 6(c).

There is one reference to the Baltimore Police Commissioner in the Charter of Baltimore City. It occurs in Article II, which provides that the Mayor and City Council

"have and [may] exercise within the limits of Baltimore City all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits; provided, however, that no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."

Charter, art. II, § 27.

■ This is reflective of the fact that the Baltimore Police Department is not an agency of the City of Baltimore and has not been for some time, *see* Acts of 1860, ch. 7, § 14; *Mayor &*

*City Council of Baltimore v. State,* 15 Md. 376, 454–55, 1860 WL 3363, *35 (1860) (upholding legislative act that placed the Baltimore City Police Department under the control of Police Commissioners appointed by the State's General Assembly [10]), and suggests the reason therefor. *See Upshur v. Mayor & City Council of Baltimore,* 94 Md. 743, 756–57, 51 A. 953, 958 (1902) (noting that "during [the] period when the police force was wholly under the control of the municipality, the city authorities failed to suppress disorder ...."). *See also Mayor & City Council of Baltimore v. Silver,* 263 Md. 439, 447, 283 A.2d 788, 792 (1971) (noting that in 1860, the General Assembly of Maryland was "intent upon taking the City of Baltimore out of the business of controlling civil disorders"). Pursuant to Acts of 1860, ch. 7, the Baltimore Police Department was removed completely from the control of the city government:

> "The police board was created, and its members, and the force enrolled by them, were made state officers; and the city was denied, in the most positive manner, any right to interfere with or control the policemen. The underlying purpose was to deprive the city of all power over the police."

*Upshur,* 94 Md. at 756, 51 A. at 958.

The power to remove the commissioners "for official misconduct" originally resided with the General Assembly from 1867

---

**10.** Among the challenges that the City of Baltimore made to the legislation removing the police from its control was that appointment of the police commissioners by the General Assembly was a violation of the separation of powers prescribed by Article Six of the Declaration of Rights of the Maryland Constitution—appointment being an inherently executive function. That argument was rejected, the Court concluding that "this Article is not to be interpreted as enjoining a complete separation between these several departments." *Mayor & City Council of Baltimore v. State,* 15 Md. 376, 454–55, 1860 WL 3363, *37 (1860)

During this period, the Governor had no power to appoint, except that he could fill vacancies during the recess of the Legislature. "From 1867 to 1900 the General Assembly, if in session, was authorized to remove the commissioners for official misconduct, and during the recess of the Legislature, the Governor was empowered to remove them on conviction of any felony before a court of law, and to appoint successors to such delinquent commissioners until the next meeting of the Legislature." *Cull v. Wheltle,* 114 Md. 58, 78, 78 A. 820, 821 (Md.1910).

until 1900. *Cull v. Wheltle,* 114 Md. 58, 78, 78 A. 820, 821 (1910). If the General Assembly was not in session, the Governor was empowered to remove a commissioner convicted of any felony before a court of law, and to appoint a successor to such delinquent commissioner until the next session of the Legislature. *Id.* at 78–79, 78 A. at 821. Thereafter, by chapter 15 of the Acts of 1900, the Governor was empowered to appoint, with the advice and consent of the Senate, the three police commissioners. Amending then Article 4, § 740 of the Code of Public Local Laws, that Act also made the commissioners subject to removal by the Governor "for official misconduct or incompetency, in the manner provided by law in the case of other civil officers" and entrusted to the Governor, "in case of the death, resignation, removal or disqualification of any commissioner" and "subject to the provisions of [§ 740], and of the Constitution of the state," [11] the appointment of their successor "for the remainder of the term so vacated." *Id.* at 79, 78 A. at 821.

The Baltimore City Police Department was placed under the supervision and direction of a Police Commissioner by the Acts of 1966, ch. 203. Section 16–4 of the Code of Public Local Laws, thereby enacted by the General Assembly, provided:

> "The affairs and operations of the department shall be supervised and directed by a commissioner of police, who shall function as the chief police and executive officer of the department, and be known as the Police Commissioner of Baltimore City."

Authority was given to the Governor for the Police Commissioner's appointment, § 16–5(a) ("[t]he Police Commissioner of Baltimore shall be appointed by the Governor of Maryland for a term of six years") and removal. Section 16–5(e) ("Said

---

**11.** Section 15 of Article 2 of the Constitution states: " "The Governor may suspend or arrest any military officer of the State for disobedience of orders or other military offense; and may remove him in pursuance of the sentence of a court-martial; and may remove for incompetency or misconduct all civil officers who received appointment from the executive for a term of years." "

Commissioner shall be subject to removal by the Governor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers."). Significantly, § 16–2(a) was unambiguous in stating that "[t]he Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland."

The power to appoint and remove the Baltimore City Police Commissioner was shifted, in 1976, from the Governor to the Mayor of Baltimore City. By Laws of Maryland 1976, ch. 920, § 16–5(a) of the Code of Public Local Laws was amended to provide for appointment by "the Mayor of Baltimore City, subject to confirmation by the City Council by a majority vote of its members, for a term of six years," and § 16–5(e) was amended to substitute "Mayor" for "Governor." [12]. Despite these changes, and others not here relevant,[13] § 16–2, which designates the Baltimore Police Department as an agency of the State, remained, and still remains, unchanged.

The decisions of this Court concerning the liability of the City of Baltimore for the acts, activity and inaction of the Police Department, over which it has no power, have been consistent and unequivocal, premised on, and holding uniformly, that the Baltimore Police Department is an entity of the State, and not of the City of Baltimore. *Silver,* 263 Md. at 449–50, 283 A.2d at 793–94 (noting that, by making the Police Department a state agency, with "control of the department ... vested in the State with immediate supervision and direction of the department under a police commissioner who is appointed by the Governor," the Legislature "removed the incongruous imposition of liability of the City for the acts of

---

12. Section 16–5(e) now provides:
   "The Police Commissioner shall be subject to removal by the Mayor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers.".

13. Sections 16–6, relating to acting commissioners, and 16–9, relating to annual reports, were also amended.

the police department over which it had no control"); *Green v. Mayor and City Council of Baltimore City,* 181 Md. 372, 376, 30 A.2d 261, 263 (1943) (noting that "[a]s the police department is an agency of the state, and not of the city, the effect of any action against it would be against the state"), *Taxicab Company of Baltimore City v. City of Baltimore,* 118 Md. 359, 367, 84 A. 548, 550 (1912) *(citing Sinclair v. Mayor & City Council of Baltimore,* 59 Md. 592, 597, 1883 WL 6071, *3 (1883), in noting that " 'the power of the city government is confined to mere matter of regulation by proper ordinance ... the enforcement of the regulation is entirely dependent upon a separate and independent police department, over which the city has no control' "). Additionally, in *Clea v. Mayor & City Council of Baltimore,* 312 Md. 662, 668–69, 541 A.2d 1303, 1306 (1988), this Court noted:

> "By Ch. 367 of the Acts of 1867, the General Assembly of Maryland made the Police Department of Baltimore City a state agency; its officials and officers were designated as state officers. Since that time, this Court has consistently held that Baltimore City should not be regarded as the employer of members of the Baltimore City Police Department for purposes of tort liability.
>
> \* \* \*
>
> "It is true that, by Ch. 920 of the Acts of 1976, the General Assembly transferred the power to appoint the Baltimore City Police Commissioner from the Governor to the Mayor of Baltimore City. At the same time, however, the General Assembly maintained the express designation of the Baltimore City Police Department as a *state* rather than a local government agency. Furthermore, the General Assembly, and not the Baltimore City Council, has continued to be the legislative body enacting significant legislation governing the Baltimore City Police Department."

(Internal citations and footnotes omitted) (emphasis in original).

B.

As we have seen, notwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency. Accordingly, the Mayor's authority in that regard is not inherent. Nor is its basis the City Charter-the power given the Mayor, by Article IV, is to appoint and then to remove, "at pleasure," certain "municipal officers," that Article quite clearly, if not explicitly, does not refer to the Baltimore City Police Commissioner. Rather, the Mayor has no more authority to remove the Police Commissioner than did the Governor, to whose authority he simply acceded. Before 1976, when that accession occurred, the Police Commissioner could have been removed by the Governor only for cause, "for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers." [14] After 1976, when the Mayor assumed the appoint-

---

14. Maryland Code (1984, 2004 Replacement Volume) § 3–307 of the State Government Article prescribes the procedure for removal of a civil officer:

"Governor's authority—investigation of complaint

"(a) On the filing of a complaint against a civil or military officer who may be suspended or removed from office by the Governor, the Governor:

"(1) shall provide to the respondent:

"(i) a copy of the complaint; and

"(ii) notice of the time when the Governor shall hear the complaint;

"(2) may summon any witness to testify concerning the complaint, pay the witness a fee of $1 a day for attending, and reimburse the witness for travel expenses incurred in testifying;

"(3) may designate one or more individuals to attend on the Governor's behalf any part of any hearing that relates to the establishment of the facts of the complaint; and

"(4) may order either party or the State to pay any costs of the proceeding.

"Governor's authority—enforcement of orders

"(b) The Governor, in the same manner as a court of the State, may enforce:

"(1) the attendance of a witness summoned under subsection (a)(2) of this section; or

"(2) an order under subsection (a)(4) of this section for payment of costs by a party or the State.

ing and removal responsibility, removal required the same cause.

## C.

For the petitioners, this does not end the inquiry. Viewing the provisions of § 16–5(e) of the Public Local Laws as a "baseline" for, rather than a prohibition on, the Mayor's removal power, they argue that the parties could, as they did, contract for a more favorable, to the Mayor, removal provision, that the law does not "prohibit the City from entering into a contract with a prospective police commissioner that contains terms of removal additional to those that it identifies." The petitioners rely, as indicated, on *County of Giles v. Wines*, 262 Va. 68, 546 S.E.2d 721 (2001) and *Thompson v. Adams*, 268 F.3d 609, 612–13 (8th Cir.2001) [15] for the proposition, "in employment cases involving analogous facts, courts in other jurisdictions have declined to hold that municipal ordinances and municipal employment manuals enumerating specific causes for which an employee may be terminated, but not stating that those causes are the 'only' causes for termination, preclude the municipality from terminating an employee for causes other than those enumerated, or for no cause." The

---

Payment of costs by State
"(c) If the State is ordered to pay costs under subsection (a)(4) of this section, the Comptroller shall issue a warrant to the Treasurer to pay the costs."

**15.** The petitioner also relies on *Cochran v. Seniors Only Financial, Inc.*, 209 F.Supp.2d 963, 967 (S.D.Iowa 2002), which it describes as "a case involving an employment contract between private parties." Consistent with *County of Giles v. Wines*, 262 Va. 68, 546 S.E.2d 721 (2001) and *Thompson v. Adams*, 268 F.3d 609, 612–13 (8th Cir.2001), the court in that case opined:

"Defendant's manual has a section entitled 'Involuntary Termination,' and it states only that 'an employee may be discharged for cause.' ... Despite what plaintiff alleges, ... defendants' manual does not state that plaintiff may be terminated *only* for cause. The Court finds that the statement that an employee may be terminated for cause leaves open the possibility that the employee may also be terminated without cause, and thus the employment-at-will doctrine is not restricted. Defendants' manual simply does not guarantee that an employee will be discharged only for cause."

petitioners urge that the same result is appropriate in this case, notwithstanding that, here, unlike in those cases, it is a statute that is being interpreted.

In *County of Giles,* the issue was whether sufficient evidence had been presented to support a jury finding that the plaintiff had an employment contract terminable at will. *Id.* at 721. The municipal employee plaintiff was employed, and had been for two years, as a recreation area manager, a position which he performed well and for which he received significant pay increases. When four new Board of Supervisor members were elected, he was fired, without notice and without being told the reason for the termination. *Id.* at 722. A personnel policy that he argued was applicable provided: "[a]n employee may be discharged for inefficiency, insubordination, misconduct, or other just cause." *Id.* The plaintiff claimed he had been terminated without cause, in violation of that personnel policy, which, he interpreted as requiring that termination be for "just cause." The Supreme Court of Virginia did not agree. It first pointed out that, "In Virginia, an employment relationship is presumed to be at-will, which means that the employment term extends for an indefinite period and may be terminated by the employer or employee for any reason upon reasonable notice." 546 S.E.2d at 723. Then, noting that "[t]here is simply no language in this section that limits the County's power to discharge an employee without cause," 546 S.E.2d at 724, the court held:

> "The language upon which Wines relies states that an 'employee may be discharged for inefficiency, insubordination, misconduct, or other just cause.' This sentence does not state that an employee *shall only* be discharged for inefficiency, insubordination, misconduct, or other just cause; nor does it state that an employee will not be discharged without just cause."

546 S.E.2d at 723 (emphasis in original).

In *Thompson,* the plaintiff was the former City street superintendent of Bull Shoals, Arkansas, and, a twenty year City employee. 268 F.3d at 611. He had been fired by the

Mayor, with the support of the Council, after his wife addressed the Council with respect to various Council members' actions, which she characterized as unlawful. 268 F.3d at 610–611. Challenging his firing, the plaintiff alleged, in addition to retaliation, violation of his "due process rights under the fourteenth amendment by firing him without notice, a statement of reasons, and a pre-termination hearing, and that the post-termination hearing that he received was inadequate because of bias on the part of the mayor and the council members." *Id.* at 611. Acknowledging that Arkansas law customarily considered employment relationships to be "at will," that they do not contemplate "for cause" firing, he relied on the City's employment policies and procedures manual, which, he argued, "is an 'independent source,' . . . that establishes a property interest for a city employee in his or her job." 268 F.3d at 611–612.

The employment manual, to be sure, stated, in the "employment policies" section, that the City is an "at-will employer . . . [and] may terminate the employment relationship at any time for any reason with the understanding that [the City] has [no] obligation to base that decision on anything but . . . intent not to continue the employment relationship" and that "[n]o policies, comments, or writings made [in this manual] or during the employment process shall be construed in any way to waive [the] provision' regarding 'at-will' employment." 268 F.3d at 612. On the other hand, the manual stated that the City would give written notice of disciplinary action to be, or already, taken, that each employee is entitled to review of any disciplinary action and "that when the city intends to fire an employee, the city will provide 'written reasons that can be supported at a pre-termination hearing.' " *Id.* The plaintiff argued that these provisions amount to a repudiation of "at will" employment "and thus establish the necessary property interest for him." *Id.*

The court rejected this argument. Noting that "unless an employment manual contains an express provision that the employer may not fire an employee except for cause, the employment relationship is 'at will,' " and that "[a]n implied

promise is not enough," 268 F.3d. at 612 (citations omitted), it held, as the petitioner points out:

"Neither a list of grounds for firing an employee, . . . nor a description of increasingly more serious disciplinary actions to which an employee may be subject, . . . nor the delineation of a process for review of disciplinary actions, . . . nor a reference to a mandatory pre-termination hearing, . . . is sufficient to alter an employee's 'at-will' status in Arkansas. In addition, the presence of language in an employment manual asserting the employer's right to fire an employee at any time is even stronger evidence that the manual creates no guarantee for employees that they will be fired only for cause."

268 F.3d at 612–13. (Citations omitted).

The petitioners conclude:

"If a list of causes justifying removal is insufficient to trump a general presumption of at-will employment at common law, as in *County of Giles*, then such a list is certainly insufficient to trump an unambiguous contractual provision, individually negotiated by the employee, *and specifically providing for termination without cause*. Clark's case is substantially weaker, in other words, than that of the employee in *County of Giles*."

Also urging this Court to be "dubious of a claim that a provision of the Public Local Laws reflecting the specific concerns of Antebellum and Civil War-era governance in Baltimore accurately reflects the current 'public policy' of the City or the State," they note that both the Mayor and the Baltimore City Council believed it to be in the City's best interest, and thus sought, to "retain" the right to terminate the Police Commissioner at will. The petitioners query, therefore, whether, "on a subject matter now within the purview of the Mayor and City Council of Baltimore, 'public policy' should not reside with the considered decision of the Mayor and City Council in 2004, and not with a statutory enactment on the same subject rooted in the specific concerns of antebellum Baltimore."

■ We do not agree. The removal power, as articulated in § 16–5(e), we hold, is not modifiable by a MOU, and, in particular, the contractual language at issue in the case *sub judice*. In that regard, we reiterate, "a contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy." *Medex v. McCabe,* 372 Md. 28, 39, 811 A.2d 297, 304 (2002). *See also State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.,* 307 Md. 631, 643, 516 A.2d 586, 592 (1986) (holding that a contractual provision that violates public policy is invalid, but only to the extent of conflict between stated public policy and contractual provision). Thus, because the provision of the MOU that states that "[e]ither party may terminate this contract at any time, by giving forty-five (45) days prior written notice to the other," without need to provide cause, conflicts with § 16–5(e) of the Public Local Laws, that provision, pursuant to which the Mayor acted to terminate Clark, is unenforceable.

■ When this Court seeks to ascertain the meaning of a statutory or constitutional provision, it first looks to the "normal, plain meaning of the language," and, if the language is clear and unambiguous, it will not look further. *Bienkowski v. Brooks,* 386 Md. 516, 536–537, 873 A.2d 1122, 1134–1135 (2005). *See also Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590, 594 (2005) ("If the plain language of the statute is unambiguous and is consistent with the statute's apparent purpose, we give effect to the statute as it is written."); *Lee v. Cline,* 384 Md. 245, 256–257, 863 A.2d 297, 304 (2004); *Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004) ("We begin with the plain language of the [enactments]"); *Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) ("If there is no ambiguity in that language, . . . the inquiry as to legislative intent ends; we do not then need to resort to the various, and sometimes inconsistent external rules of construction").

■ Further, when the meaning of a word or phrase in a constitutional or statutory provision is clear and unambiguous,

this Court will give that word or phrase its plain and ordinary meaning, not one that is different from how it is plainly understood. *See, e.g., Montrose Christian School v. Walsh,* 363 Md. 565, 595, 770 A.2d 111, 129 (2001) (The "phrase 'to perform purely religious functions' clearly does not mean what is suggested.... We decline to construe 'purely' as if it were 'primarily' or 'some' "); *Dodds v. Shamer,* 339 Md. 540, 554, 663 A.2d 1318, 1325 (1995) (refusing to construe a statute, specifically applicable to only four named counties, as applicable to other counties); *Davis v. State,* 294 Md. 370, 378, 451 A.2d 107, 111 (1982) (declining to construe the phrase in a statute as petitioner requested, finding that such an action would be to re-draft the statute under the guise of construction); *Mauzy v. Hornbeck,* 285 Md. 84, 93, 400 A.2d 1091, 1096 (1979) (refusing to construe the statutory phrase "all professional employees" as "only certain types of" professional employees); *Wheeler v. State,* 281 Md. 593, 598, 380 A.2d 1052, 1054 (1977), *cert. denied,* 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86 (1978) ("We are not at liberty to bring about a different result by inserting or omitting words to make the statute express an intention not evidenced in its original form").

We do not read the term, "subject to removal," as used in § 16–5(e) of the Public Local Laws of Baltimore City, merely to establish a "baseline," as the petitioner argues. Section 16–5(e) articulates the reasons for which the Police Commissioner is "subject to removal by the Mayor." The reasons it enumerates, "for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness," are exclusive; "subject to" simply does not mean and is not the equivalent of, "inter alia." Section 16–5(e) simply does not contemplate that there will be other reasons for termination, and thus does not permit the Mayor to add any, i.e. extend its reach. Similarly, therefore, adding three other reasons for removal for just cause, that of gross negligence, substance abuse, and indictment of felonies or any other crimes of moral turpitude or theft, to those already statutorily enumerated represents a further extension or expansion, of § 16–5(e).

While we acknowledge the fact that the case *sub judice* and the cases on which the petitioner relies involve an employment relationship, we do not agree that the facts are "analogous." At the outset, the context of this case must not be forgotten, because it is significantly important: the Police Commissioner remains an employee and agent of the State of Maryland even though the Mayor of Baltimore appoints the Police Commissioner and the City Council confirms. There is a real difference, we believe, in the situation in which that employment relationship, defined by statute, here Public Local Law § 16–2, as requiring termination for cause, is sought to be transformed into one which is terminable, contractually and without cause, simply on the basis that the statute is silent on the point and that where an employment relationship, that is, or is presumed to be, "at will," is sought to be converted, on the basis of statements, including the listing of causes for termination, appearing in a personnel manual, into one requiring cause to terminate. The distinction is made even more stark when it is considered that the Public Local Law provision implicates another State statute, § 3–307 of the State Government Article, prescribing, in some detail, the procedure for the removal of a civil officer.

Thus, *County of Giles* and *Thompson* may well have been correctly decided, but they are not applicable, or persuasive with regard to the interpretation of § 16–5(e) of the Public Local Laws. That section does not, and did not, authorize termination for "any reason." Rather, it very clearly made "[t]he Police Commissioner . . . subject to removal by the Mayor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers."

To be sure, the petitioners were anxious, perhaps understandably so, to have the right to terminate the Police Commissioner without cause. That desire, however, does not determine the legality or appropriateness of their actions to terminate him. As indicated, the Baltimore City Police Department is, and has been for some time, a State agency. Although the General Assembly, in 1976, transferred the

appointment power with regard to the head of that department from a State official, the Governor, to a City official, the Mayor, it is significant that that is as far as the General Assembly went. Thus, while the Department may be located in Baltimore City and the Mayor and City Council have an interest in what public policy should be with respect to that Department, it is the "considered opinion" of the General Assembly, reflected in the legislation that became § 16–5(e), not that of the City Council that is dispositive of that issue. "It is, after all, the General Assembly that sets the public policy of the State...." *Rausch v. Allstate Ins. Co.*, 388 Md. 690, 715, 882 A.2d 801, 816 (2005). *See Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 460, 456 A.2d 894, 903 (1983) ("We have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly"); *Felder v. Butler*, 292 Md. 174, 183, 438 A.2d 494, 499 (1981) ("The Court has always recognized that declaration of public policy is normally the function of the legislative branch of government"); *Adler v. American Standard Corp.*, 291 Md. 31, 45, 432 A.2d 464, 472 (1981). It is well settled that, where the General Assembly has announced public policy, the Court will decline to enter the public policy debate, even when it is the common law that is at issue and the Court certainly has the authority to change the common law. *Adler v. American Standard Corp.*, 291 Md. at 47, 432 A.2d at 473.[16]

JUDGMENT AFFIRMED, WITH COSTS.

---

**16.** The petitioners suggest that it is not the public policy of this State to "disfavor" civilian control of the Baltimore Police Department. With that proposition, we agree. We do not agree, however, that a rejection of the petitioners' argument "strips the City of authority to oversee the Police Department and its Commissioner by denying the City the authority to bargain with a candidate for the position of Police Commissioner, and to set the most fundamental accountability term in any employment contract-the term that governs how the employment relationship may be terminated." We do not believe that the *sine qua non* of oversight is the ability to fire without cause. The causes enumerated simply are not so restrictive as to interfere with or prevent oversight.